# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| MARLA MAYON, *et al.,* | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-4237 |
| | § | |
| RACETRAC PETROLEUM INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Plaintiff, Marla Mayon, filed this collective action under 29 U.S.C. § 216(b) against her former employer, RaceTrac Petroleum, Inc., a chain of 371 gasoline stations and convenience stores located in the southeastern United States.  Mayon sued on behalf of herself and similarly situated nonexempt associates and cashiers, alleging violations of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA").  Mayon alleges that the company denied her and other employees overtime pay required by 29 U.S.C. § 207(a). Mayon asks this court to authorize notice and expedited discovery.  (Docket Entry No. 2). RaceTrac has responded; Mayon has replied.  (Docket Entry Nos. 27, 30).  Based on a careful review of the pleadings, the motion, response and reply, the present record, and applicable law, this court denies Mayon's motion for notice to a putative class and for related discovery, for the reasons set out in detail below.

**I.     Background**

Mayon worked as an associate at RaceTrac from approximately June 16, 2001 until her resignation on October 28, 2003.  (Docket Entry No. 1, Ex. A; Docket Entry No. 3, Ex. 3, (Mayon Decl.)).  Although the duties of RaceTrac associates have some variation, in general they consist of working the cash register, assisting customers, and stocking and cleaning the convenience stores.  (Mayon Decl.).  Associates such as Mayon are paid an hourly wage.  It is undisputed that associates such as Mayon are covered by the FLSA.

RaceTrac employs approximately 2,500 associates nationwide.  Each store is assigned to one of eight regions, which are separately managed.  Each region is divided into areas, ranging from five to eight, with an area supervisor assigned to each.  There are a total of fifty-eight areas, and each area includes between four to ten stores.  Each store has its own manager, who is FLSA-exempt.  Each store is staffed by comanagers, night managers, shift managers, and associates.  Associates work varying hours, some more than forty hours per week, some less, and some employees work more than forty hours in some weeks but not others.

RaceTrac uses a company-wide payroll system.  Hourly employees handwrite their sign-in and sign-out times on a payroll sheet. Managers then transfer this information to the store's computer system, to be forwarded electronically to the company's payroll department in Atlanta.  The payroll software is programmed to pay FLSA-required overtime compensation to all nonexempt employees working over forty hours in a given week. RaceTrac handles employee paycheck discrepancies out of its Atlanta office. Employees are

given a toll-free telephone number to call the payroll office if they have a question about the number of hours reflected in a paycheck.

Mayon alleges that RaceTrac had a company-wide policy that required her and others to work overtime without receiving FLSA-required compensation. She asks this court to authorize notice to a nationwide class of "[a]ll associates, lead associates, lead cashiers, and cashiers working in RaceTrac's retail gasoline stations, from October 29, 2004 to the present." (Docket Entry No. 1 at 8). Mayon argues that RaceTrac followed a company-wide policy of allocating certain amounts of employee work-hours to each store, a policy that created pressure on managers to require associates to work "off-the-clock." (Docket Entry No. 3 at 14). RaceTrac allots a certain number of employee hours to each RaceTrac store based on several factors, including historical data as to the type of customer and number of customer transactions in a given store. (Docket Entry No. 27, Dep. of Ben Tison, Senior Vice-President of Operation, at 105–106). Stores that exceed their "allotment" consistently or by certain margins are tracked and may be subjected to supervisory attention, including visits by the area supervisor. Managers also have a financial incentive to keep their stores within the system's prescribed allotment of employee hours. (Docket Entry No. 30 at 8). Ben Tison, RaceTrac's Senior Vice-President of Operations, stated that approximately one-fiftieth of the formula that determines manager bonuses depends on whether the manager's store follows the authorized labor allotment. (Docket Entry No. 30, Ex. V, Tison Dep., at 123). According to Mayon, this labor policy generates company-wide pressure and incentives for managers to require off-the-clock work. (Docket Entry No. 30 at 26).

Mayon identifies, and alleges that she experienced, four categories of off-the-clock work. She asserts that the potential class members experienced at least one of the categories. The four types of off-the-clock work are: (1) associates were required to begin working before their scheduled start time, when they clock in; (2) associates were required to continue working after their scheduled shift end-time, when they clock out; (3) associates were required to perform gasoline and cigarette surveys — driving around to record competitors' gasoline and cigarette prices — while off the clock; and (4) managers would alter employees' record of hours worked, either directly on the payroll sheet or when transferring these written records into the computer. (Docket Entry No. 30, Ex. J, (Mayon Dep.) at 51–53, 73, 78–81, 88–93, 106). Mayon argues that the proposed class members are similarly situated because associates: (1) track their time in the same manner and store managers are ultimately responsible for entry of time sheets into an electronic format; (2) were trained according to corporate policy to arrive at work early; (3) work overtime for substantially the same reasons; and (4) have the same job duties. (Docket Entry No. 3 at 14–15).

RaceTrac responds that its corporate policy is to compensate employees for all hours worked. (Docket Entry No. 27, Ex. 2, (Tison Decl.)). RaceTrac places a notice of this policy on all employee paychecks and instructs employees to contact the corporate payroll toll-free telephone number if they find a discrepancy in their paycheck. (*Id.* at Ex. 6). RaceTrac also asserts that the labor allotment practice it uses does not create incentives for managers to require off-the-clock work from associates, pointing out that there are no penalties for exceeding the allotment. RaceTrac urges that this case is not appropriate for a collective

action because even at this stage of the proceedings, the record is clear that there are many variations among associates affecting whether they could or did experience any of the alleged forms of off-the-clock work Mayon identifies. The relevant variations involve whether they work full- or part-time and whether their managers required them to work off-the-clock in any of the four ways Mayon alleges. RaceTrac asserts that the record shows that whether any off-the-clock work was required varied from store to store and from manager to manager within a store, requiring individualized evidence that makes collective action treatment inappropriate.

## II.     The Applicable Legal Standards

Section 207(a) of the FLSA requires covered employers to compensate nonexempt employees at overtime rates for time worked in excess of statutorily-defined maximum hours. 29 U.S.C. § 207(a). Section 216(b) creates a cause of action for employees against employers violating the overtime compensation requirements. 29 U.S.C. § 216(b). Section 216(b) provides:

> An action . . . may be maintained . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

*Id.* Section 216(b) establishes an "opt-in" scheme under which plaintiffs must affirmatively notify the court of their intention to become parties to the suit. *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1212 (5th Cir. 1995). District courts have discretion in deciding whether

to order notice to potential plaintiffs. *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170–171 (1989); *Villatoro v. Kim Son Rest., L.P.*, 286 F. Supp. 2d 807, 808 (S.D. Tex. 2003).

Courts recognize two methods to determine whether to authorize notice to similarly-situated employees advising them of their right to join an FLSA collective action. *See Mooney*, 54 F.3d at 1213–1215. These methods are the two-step *Lusardi* approach and the spurious class action *Shushan* approach. *See id.*; *Shushan v. Univ. of Colo. at Boulder*, 132 F.R.D. 263 (D. Colo. 1990); *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987). In *Mooney,* the Fifth Circuit found it unnecessary to determine which method is most appropriate. 54 F.3d at 1216. However, "[i]t is clear that the two-step ad hoc approach is the preferred method for making the similarly situated analysis and the similarly situated standard does not incorporate Rule 23 requirements." *Basco v. Wal-Mart Stores Inc.*, 2004 WL 1497709, at *4 (E.D. La. July 2, 2004); *see also LaChapelle v. Owens-Illinois, Inc.*, 513 F.2d 286, 288 (5th Cir. 1975) (finding a fundamental difference between Rule 23 class actions and FLSA collective actions); *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 n.12 (11th Cir. 1996) (noting that "the requirements for pursuing a § 216(b) class action are independent of, and unrelated to, the requirements for class action under Rule 23"); *Mielke v. Laidlaw Transit, Inc.*, 313 F. Supp. 2d 759, 762 (N.D. Ill. 2004) (stating that the majority of courts have employed or implicitly approved the two-step method); *Villatoro*, 286 F. Supp. 2d at 810.

"*Lusardi* and its progeny are remarkable in that they do not set out a definition of 'similarly situated,' but rather they define the requirement by virtue of the factors considered

in the [two-stage] analysis." *Mooney*, 54 F.3d at 1213. The first step of analysis is the "notice stage" in which the district court decides whether to issue notice to potential class members. *See id.* at 1213–1214. The court's decision is usually based only on the pleadings and any affidavits that have been submitted. *Id.* "Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class" where potential class members receive notice and the opportunity to opt-in. *Id.* at 1214 n.8. The lenient standard appears to require only substantial allegations that potential members "were together the victims of a single decision, policy, or plan . . . ." *Id.* (citing *Sperling v. Hoffmann-La Roche, Inc.*, 118 F.R.D. 392, 407 (D.N.J. 1988)). A factual basis for the allegations is needed to satisfy this first step. *See Hall v. Burk*, 2002 WL 413901, at *3 (N.D. Tex. Mar. 11, 2002) (stating that "[u]nsupported assertions of widespread violations are not sufficient to meet Plaintiff's burden"); *see also Haynes v. Singer Co., Inc.*, 696 F.2d 884, 887 (11th Cir. 1983). Some courts place an emphasis on finding "some identifiable facts or legal nexus [that] bind the claims so that hearing the cases together promotes judicial efficiency." *Barron v. Henry County Sch. Sys.*, 242 F. Supp. 2d 1096, 1103 (M.D. Ala. 2003) (citing *Sheffield v. Orius Corp.*, 211 F.R.D. 411, 416 (D. Or. 2002)); *see Basco*, 2004 WL 1497709, at *5 (quoting *Heagney v. European Am. Bank*, 122 F.R.D. 125, 127 (E.D.N.Y. 1988) (stating that certification is appropriate where some factual nexus binds named plaintiffs and potential class members as victims of a particular alleged policy or practice)). "A court may deny plaintiffs' right to proceed collectively if the action arises from circumstances purely personal to the plaintiff, and not

from any generally applicable rule, policy, or practice." *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 507 (M.D. La. 2005); *see Barron*, 242 F. Supp. 2d at 1104 ("[T]he mere fact that violations occurred cannot be enough to establish similarity, as that would not ultimately be sufficient to establish a pattern and practice without a showing that the violations were more than sporadic occurrences."). If a court conditionally certifies a class, the action proceeds as a collective action during discovery. *See Mooney*, 54 F.3d at 1214.

The second stage of inquiry typically occurs when discovery is largely complete and the defendant moves to "decertify" the conditionally-certified class. *See id.*; *Lusardi*, 118 F.R.D. at 359. At that point, the court makes a factual determination as to whether there are similarly-situated employees. *Id.* If the district court finds that the claimants are similarly situated, the collective action may proceed. *See Mooney*, 54 F.3d at 1214; *Basco*, 2004 WL 1497709, at *3. If the court decertifies the class, the opt-in plaintiffs are dismissed without prejudice and the original plaintiffs proceed on their individual claims. *See id.*; *England*, 370 F. Supp. 2d at 508.

Several courts have concluded that when substantial discovery has occurred, the court may bypass the first stage and proceed directly to the second stage of the certification analysis. *See England*, 370 F. Supp.2d at 509 (stating that analysis under the second step was proper because substantial discovery had occurred, providing a sufficient record); *Basco*, 2004 WL 1497709, at *4; *Pfohl v. Farmers Ins. Group*, 2004 WL 554834, at *3 (C.D. Cal. Mar. 1, 2004) (finding that the second-step inquiry was appropriate when the parties agreed that sufficient discovery related to certification had been undertaken).

Generally, district courts consider three second-stage factors to determine if putative plaintiffs are similarly situated: (1) whether they share similar factual and employment settings; (2) whether various affirmative defenses would have to be applied individually to each plaintiff; and (3) fairness and procedural concerns. *Mielke*, 313 F. Supp. 2d at 762; *see Lusardi*, 118 F.R.D. at 359 (listing these three factors as primary reasons for decertification along with a fourth factor specifically related to ADEA suits).

### III.   Analysis

#### A.   The Record and the *Lusardi* Analysis

In this case, the parties have conducted much more discovery than is usually available at the first step of the two-step analysis. RaceTrac has deposed Mayon and eleven other potential collective action participants who filed affidavits indicating their desire to opt into the class. Although 12 depositions is not necessarily "extensive," at a hearing in this case, counsel for Mayon and for RaceTrac agreed that the testimony from these depositions is representative of the results that more discovery would produce. (Docket Entry No. 39). More depositions of RaceTrac associates would yield more similar testimony, but would not provide different or new information. In addition, many of the issues were explored in a companion case, *Schiff v. RaceTrac Petroleum, Inc.*, No. 2-02-CV-402 (TJW) (E.D. Tex. Aug. 23, 2004). (Docket Entry No. 27, Ex. 9). In that case, the district judge preliminarily certified a class of RaceTrac managers asserting FLSA overtime violations, but declined to certify a class of associates for notice purposes, stating as follows:

> . . . the evidence "demonstrate[s] that the [practice of having associates perform off-the-clock work] was not even uniformly or systematically implemented at any given store." The evidence shows that some associates, some of the time conducted various surveys because the work was delegated to them by their manager. This is not enough to support Plaintiffs' burden to show that associates are similarly situated to the class of managers already certified and entitled to nationwide notice.

(*Id.* at 8–9 (citing *Basco*, 2004 WL 1497709, at *7)). The allegations and procedural posture of this case is similar to *Basco*. In that case, a group of plaintiffs sought to certify a FLSA class of all hourly employees of Louisiana Wal-Mart and Sam's Club stores who did not receive overtime pay for off-the-clock work. 2004 WL 1497709, at *2. The court found that Wal-Mart had a policy of keeping wage costs low, but that the effects of this policy were "neither homogenous nor lend themselves to collective inquiry. The effects of this policy as alleged are anecdotal, that is to say particularized." *Id.* at *7. The court denied plaintiffs' motion to certify a FLSA class and approve notice. *Id.* at *9.

The amount of discovery and information available to the parties and court in this case is not as extensive as in some of the cases that have proceeded directly to the second step, but is far more extensive than is typical of a first-step analysis. This court finds that the discovery conducted and information available is sufficient to permit a determination whether the members of the putative class are similarly situated, without relying on notice and extensive additional discovery.

The discovery and information available in the present record shows considerable variation among the potential plaintiffs and their allegations.[1] The testimony demonstrates a significant variation in whether and how the employees experienced any form of required off-the-clock work, depending on the store they worked in and the manager they worked for. Not all the testifying employees claim that RaceTrac management deprived them of overtime pay, and many did not experience the four categories of off-the-clock work that Mayon alleges. Testimony from the twelve depositions ranges from that of Scott Shanteau, who essentially alleges no FLSA violation, to that of Mayon and three others who assert that all four categories of off-the-clock work occurred, but with significant variations. The variations can be described by summarizing the testimony of each deponent.

- Jennifer Ashley: Ashley worked as an associate and manager at RaceTrac. Ashley performed unpaid gasoline surveys. (Dep. at 26–30, 38). She received a dollar per survey that she performed as a manager, but was not paid for surveys she performed as an associate, nor for the time she spent performing these surveys. (*Id.* at 33, 38). Ashley performed preshift off-the-clock work for most, but not all, managers. (*Id.* at 17–19, 38). Ashley received full compensation for any postshift work under all managers except one. (*Id.* at 42, 51).

- Steven Bade: Bade stated that he worked under different managers and that one, "Mark," changed entries on some time sheets for some of the weeks Bade worked. (Dep. at 35-36, 47). Bade completed unpaid gasoline surveys under Mark as well.

---

[1] The evidence also demonstrates that several of the twelve potential collective action plaintiffs would be precluded from joining Mayon's suit. For example, Perron Barconey, one of the affiants who indicated a desire to opt in and who was deposed, testified that he was a RaceTrac manager and never occupied an associate or cashier position. (Docket Entry No. 27, Barconey Dep. at 6). Barconey's opt-in consent form, however, states that he was an associate from approximately October 2001 to September 2002. (Docket Entry No. 5, Ex. A, at 21). Similarly, Michelle Hopkins, another affiant stating a desire to opt in to the proposed collective action, testified based on her experience as a night manager, not an associate. (Docket Entry No. 30, Ex. Q, (Hopkins Dep.) at 7). Scott Shanteau, another affiant, may be unable to pursue a claim because he does not work full-time. (Docket Entry No. 27, Shanteau Dep. at 11–12).

Bade reported no significant preshift uncompensated work. (*Id.* at 54, 77). His work under managers other than Mark was fully compensated.

- Perron Barconey: Barconey never worked as an associate. (Dep. at 6). Barconey completed unpaid gasoline and cigarette surveys, but only as a manager. (*Id.* at 12–20).

- Lyndsey Ferguson: Ferguson recalled working for three managers or comanagers. One comanager, "Ms. Luann," occasionally directed her to work off-the-clock ten minutes before her scheduled shift, which could include a gasoline survey. (Dep. at 29–33, 37). To her knowledge, whether this practice occurred depended on the particular manager. (*Id.* at 30–31). Ferguson only worked off-the-clock after her shift if she clocked out and then had to complete a task that had been forgotten, not because a manager required her to do so. (*Id.* at 47). She cannot recall if this occurred more or less than ten times during her time as an associate. (*Id.* at 47–48). If the off-the-clock task required a significant amount of time to complete, Ferguson would clock out at her actual time. (*Id.* at 57).

- Angie Mae Fowler: Fowler worked at three stores in Florida and Texas. Fowler was a part-time employee at one store. (Dep. at 58). She became a comanager at another location. (*Id.* at 88). Two managers Fowler worked for as an associate told her that she had to work off-the-clock. (*Id.* at 58). These managers did not alter her time sheets. (*Id.* at 72). After Fowler transferred from the Dallas area to Houston, she stated that one manager, Nelson, instructed her to change timesheet entries. A comanager trainee in Houston, Bonita, also changed time sheets in Fowler's presence. (*Id.* at 91–94). As an associate, Fowler completed unpaid gasoline surveys at one store in Houston, but not in her Dallas-area store. (*Id.* 111–115). As a comanager, she completed unpaid gasoline and cigarette surveys. (*Id.* at 117–120, 123). At another location, she worked off-the-clock after her shift, but generally, this occurred only after her promotion to comanager. (*Id.* at 124–125).

- Hazel Griffith: Griffith worked at three Louisiana stores in Hammond, Kenner, and Boutte, under the same area supervisor. (Dep. at 89). She was promoted to a managerial position on January 1, 2002. (*Id.* at 15). She stated that some of the managers changed her timesheet entries: one manager in Kenner, a different manager in Hammond, and two different managers in Boutte. (*Id.* at 54–58, 78–79). Griffith completed unpaid gasoline and cigarette surveys at one store, but noted that at another store, only associates "real close to the manager" performed surveys. (*Id.* at 30–31). She worked off-the-clock before her scheduled shift start-time under a manager named Cherlyn at the Kenner store, but was not required to do so for other managers. (*Id.* at 45–48).

- Jessica Hagarty: Hagarty worked as an associate at three Florida stores but did not always work full-time. (Dep. at 16). Each store had a different manager, but the same area supervisor. (*Id.* at 14). A manager or supervisor at one store told Hagarty to record her scheduled time, and not the time she actually worked. (*Id.* at 49). In at least two stores, associates performed uncompensated cigarette counts, a type of inventory. (*Id.* at 56–57). A manager from one store altered Hagarty's time sheets to reflect scheduled hours, or the store's allotted hours, rather than the actual hours worked. (*Id.* at 72–74, 81–82). At another location, Hagarty's time sheets were not altered. (*Id.* at 83) Hagarty completed preshift gasoline surveys three or four times per week at two of the stores. (*Id.* at 86–91). At one location, she received one dollar compensation for each survey. (*Id.*). Hagarty also completed candy surveys while at on store — collecting current candy prices from competing convenience stores. (*Id.* at 85). She is the only deponent who mentioned candy surveys. Hagarty worked off-the-clock before her scheduled shift times at all three stores. (*Id.* at 28–29). Hagarty recalled being warned about clocking out after her scheduled end time by her manager at one store and the area supervisor. (*Id.* 35–39, 47–48).

- Michelle Hopkins: Hopkins worked at three central Florida stores, Kirkman, Goldenrod, and John Young. Hopkins also worked for a time as a night manager. She asserts that she was required to work off-the-clock at John Young. (Dep. at 7). Hopkins stated that associates worked off-the-clock at all three stores. (*Id.* at 41). Some of her managers required her to clock in at her scheduled time, regardless of when she arrived and began working. (*Id.* at 15). Hopkins recalled one instance at Kirkman when her timesheet was altered to reduce the number of hours she worked. (*Id.* at 71). She completed gasoline surveys at Kirkman and John Young, and arrived early and stayed late off-the-clock while at John Young. (*Id.* at 14–15, 23, 30–32, 43, 47). Hopkins saw associates performing gasoline surveys at John Young, but not at Goldenrod. (*Id.* at 23, 25). Other associates completed off-the-clock cigarette counts at John Young and Goldenrod. (*Id.* at 47–48).

- Vladimir Jacaj: Jacaj worked for multiple Florida stores and managers, first as an associate and then as a comanager. His deposition does not specify the stores where or managers for whom he was working when he performed off-the-clock work. Jacaj noted a one-time discrepancy in his pay check, and he believes RaceTrac undercompensated him for a two-day period. He did not notice the discrepancy at the time. (Dep. at 90–91). Along with other associates, Jacaj completed unpaid gasoline surveys when no manager was on duty or when the manager could not leave the store. (*Id.* at 36, 41, 64). Jacaj also performed uncompensated gasoline surveys at the end of his shift as third-shift manager. (*Id.* at 37, 41). After his promotion to comanager, an hourly position, Jacaj worked off-the-clock after his shift ended. Jacaj reported

that he arrived to work ten minutes early without pay, without specifying which manager or store required such work. (*Id.* at 77–78).

- Marla Mayon: Mayon worked for several different managers. Mayon alleged that one manager, Tonja, altered her time sheet. Mayon reported the incident to RaceTrac's toll-free number, but did not receive a reply. (Dep. at 47). Another time, Mayon worked two days during her vacation at the request of another manager, Rene. Rene told her not to clock in, but that Mayon would be reimbursed. Mayon was not reimbursed. (*Id.* at 48). Mayon reported that all the managers in her store required postshift off-the-clock work by requiring employees to sign out at the end of their scheduled shift, regardless of whether employees stopped working. (*Id.* at 50). Mayon identified four managers (Tonja, Rene, Lisa, and Terry) who required employees to complete their shift duties after clocking out. (*Id.* at 51). She often worked between sixty to ninety minutes after clocking out at the end of her scheduled shift. (*Id.* at 51–53). Mayon stated that these managers also instructed her to arrive at work thirty minutes early. (*Id.* at 73). Mayon recalled two occasions when different managers, Janice and Tonja, changed payroll sheet entries. (*Id.* at 78). She did not observe either manager changing Mayon's time. (*Id.* at 79). RaceTrac required Mayon to complete at least one, and up to five or six, unpaid surveys per week. (*Id.* at 93). This began with Mayon's employment under manager Rene, and lasted "[p]retty much until the end." (*Id.* at 88). Mayon identified three other associates who performed gasoline surveys. (*Id.* at 92).

- Brandy Mobbs: Mobbs worked as an associate throughout her RaceTrac employment. Mobbs performed unpaid gasoline surveys under three managers, Kenneth, Hassan, and Lissa. (Dep. at 22). She stated that she was never told to clock in or not: "It was my decision." (*Id.*). She also testified that she had never worked over 40 hours a week without being paid overtime, although she knew of other associates who had. (*Id.* at 52). Other than performing gasoline surveys — at times in addition to a 40-hour work week — Mobbs did not report any uncompensated time. (*Id.* at 67). Mobbs alleged that one of her managers altered her time sheet, but does not specify who nor how often. (*Id.* at 71). Mobbs recalled one specific incident when Lissa altered time records, and said that she had heard that both Hassan and Lissa altered time records. (*Id.* at 75). Mobbs acknowledged that two of her managers never falsified her records. (Dep. at 75–80). Mobbs completed unpaid surveys, yet she stated that it was her choice not to clock-in for the surveys and that she did not do such surveys for all the managers she worked with. (*Id.* at 21–25, 58–60, 70–73).

- Scott Shanteau: Worked only as a part-time associate at two Florida stores. (Dep. at 11–12). With one exception, Shanteau never worked more than twenty hours in a

week. (*Id.* at 12–13.) During the only week he worked over forty hours, Shanteau specifically recalls that no mandatory off-the-clock work occurred. (*Id.* at 23). He alleges that none of the four types of violations occurred. Shanteau's only substantive allegation is that some managers occasionally held mandatory off-the-clock store meetings. (*Id.* at 19–23). He recalled attending five such meetings during his career. (*Id.* at 21). No manager ever told Shanteau to work off-the-clock, and he stated "[n]o, [off-the-clock work] hasn't been an issue for me." (*Id.* at 28–29).

Counsel for both sides argue that if notice issued, additional discovery was conducted, and additional putative plaintiffs testified, the variation among the putative class members would persist. (Docket Entry No. 39). Because the discovery provided in the present record is both extensive and representative of the information that additional discovery would provide, it is not necessary to require that additional discovery be completed before the court assesses the second-step factors. *See Basco*, 2004 WL 1497709, at *5. "[T]he two 'step' inquiry somewhat collapses into one" when the record presents the nature and quantity of evidence that is available here. *Id.*, at *7 n.8. Like the *Basco* court, this court will perform the second-step inquiry as well as the first-step analysis. *Id.*

### B.     The Requirement of Similarly-Situated Employees

Mayon's assertions of a common RaceTrac plan are similar to the unsuccessful *Basco* plaintiff's allegations. In that case, Wal-Mart used a computer scheduling program to "optimize the hours worked in relation to the historical needs of the business." *Basco*, 2004 WL 1497709, at *6. Wal-Mart expected labor costs to remain at a fixed level proportionate to sales revenues. *Id.* The *Basco* plaintiffs described this policy as "limiting the amount of work its employees are allowed to perform on the clock during the week but not the amount of work they are required to do." *Id.* This type of scheduling system, along with a

managerial bonus related to profitability, allegedly resulted in a company-wide incentive and practice to undercompensate employees by requiring them to work off-the-clock. *Id.* In finding that the proposed class members were not similarly situated, the court held that a corporate policy to keep wage costs low was insufficient to certify the class even at the lenient first stage. *Id.*, at *7. The court explained:

> It is obvious from the discovery presented that this "policy" and its effects are neither homogenous nor lend themselves to collective inquiry. The effects of the policy as alleged are anecdotal, that is to say particularized. Plaintiffs' own witnesses demonstrate that the "policy" was not even uniformly or systematically implemented at any given store. While it is true that this "lesser" standard should not preclude certification, and "similarly situated" does not mean identically situated, plaintiffs have failed in their burden of proof to demonstrate identifiable facts or legal nexus that binds the claims so that hearing the cases together promotes judicial efficiency.

*Id.*

The court then proceeded to examine the second-step factors of disparate factual and employment setting, disparate defenses, and fairness and procedural concerns. *Id.*, at *8. First, the court found that disparate settings — individual managers could react to Wal-Mart's scheduling policy differently and stores in different areas face different pressures and sales dynamics — indicated that certification was inappropriate. *Id.* Next, the court agreed with Wal-Mart's assertion that it would be entitled to argue seven disparate individualized defenses.[2] *Id.* The availability of these defenses heightened the individuality of the claims and assisted the court in determining that a collective action would present manageability problems due to the lack of a single policy or plan. *Id.* (quoting *Mooney*, 54 F.3d at 1213

---

[2] The defenses that RaceTrac asserts track those outlined in *Basco*.

n.7). The court concluded that potential plaintiffs "performed different jobs at different geographic locations and were subject to different managerial requirements which occurred at various times as a result of various decisions by different supervisors made on a decentralized employee-by-employee basis." *Id.*, at *8. The court denied Basco's motion for certification. *Id.*, at *9.

Like the plaintiff in *Basco*, Mayon does not allege that RaceTrac pursued a common plan or policy to deny associates overtime compensation *directly*, but rather argues that the common scheduling system *indirectly* resulted in off-the-clock work because of the pressure exerted on managers to meet their stores' targeted weekly hours. Mayon relies on this system to provide a factual nexus among the associates to justify conditional certification at *Lusardi's* first step. Mayon admits that the mere use of a labor schedule to control costs does not represent such a nexus; she instead asserts that this requirement is satisfied by the resulting systemic pressure to work off-the-clock. (Docket Entry No. 30 at 25–26). The evidence is clear that even assuming, without deciding, that the policy creates the incentive Mayon identifies, the effects are neither consistent nor similar. They vary according to specific managers working at different times in different stores. The depositions show that different managers followed different practices with respect to off-the-clock work, with variations even within a single store. Mayon fails to demonstrate a sufficient basis for certification at the lenient first stage of analysis because an incentive program, aimed at keeping costs low, is in itself insufficient to justify class certification. *See Basco*, 2004 WL 1497709, at *6–7.

At *Lusardi's* second stage, the court considers whether the proposed collective action presents: (1) disparate factual and employment settings; (2) individualized defenses available to RaceTrac; and (3) fairness and procedural considerations weighing against certification. As in *Basco*, the record here shows that the potential plaintiffs "were subject to different managerial requirements which occurred at various times as a result of various decisions by different supervisors made on a decentralized employee-by-employee basis." *See* 2004 WL 1497709, at *8. Employees from stores in different geographic regions testified that their experiences under RaceTrac's scheduling system were often substantially different. Shanteau worked at two Florida stores and experienced no off-the-clock work violations similar to those reported in other states. Hagarty worked at three Florida stores and alleges different off-the-clock violations at each. Griffith reported that managers at three Louisiana stores changed her time sheets, but only one required gasoline and cigarette surveys or other off-the-clock work. Fowler alleged that her Houston-area store managers altered her time sheets, but her Dallas-area store managers did not. Associates confirmed that the managerial response to corporate policy was dissimilar even within a given store. Several deponents, including Ashley, Bade, Ferguson, and Fowler reported that some of their managers required off-the-clock work, and others did not. Many deponents, including Bade, Fowler, Hagarty, Hopkins, Mobbs, and Mayon stated that some managers, but not others, would alter time sheets or computerized time records. The disparate factual and employment settings weigh against proceeding as a collective action.

This court agrees with RaceTrac that the company would be able to assert numerous individualized defenses. The record shows that RaceTrac could contend that: (1) no off-the-clock work occurred that resulted in a section 207(a) violation;[3] (2) managers and supervisors were unaware of off-the-clock work and associates failed to take advantage of the company's system for reporting paycheck discrepancies; (3) claims are barred because the disputed work was either preliminary or postliminary to an employee's principal activities; (4) off-the-clock work falls into the FLSA *de minimis* exception;[4] (5) claims are barred because of statute of limitations; (6) managers acted in good-faith and liquidated damages are inappropriate; and (7) employees claiming to be associates were actually managers.[5] Difficulties in managing Mayon's proposed collective action further weigh against certification. As in *Basco*, individualized claims predominate and no evidence of a unified policy of off-the-clock work

---

[3] Shanteau's deposition is an example: even if an employee worked off-the-clock, a section 207(a) violation may not have occurred. Off-the-clock work for part-time employees like Shanteau, would not automatically result in their exceeding forty hours, a prerequisite to violating FLSA overtime provisions. *See* 29 U.S.C. § 207(a)(1). Similarly, Hagarty's statement that "[RaceTrac does not] just start people on like a 40-hour shift" creates additional concerns that working off-the-clock may not give rise to an FLSA cause of action. (Docket Entry No 27, Hagarty Dep. at 16). If "full-time" employees do not consistently work forty-hour weeks, RaceTrac may argue, on a case-by-case basis, that off-the-clock practices do not result in section 207(a) violations because the practices do not push a given employee above the forty-hour threshold.

[4] Some deponents stated that they were often told to arrive ten minutes before their scheduled shift. RaceTrac is entitled to argue that this falls into the *de minimis* exception. *See Lindow v. United States*, 738 F.2d 1057, 1062 (9th Cir. 1984) (stating that "[m]ost courts have found daily periods of approximately ten minutes *de minimis* even though otherwise compensable").

[5] The statements of Angie Mae Fowler, Hazel Griffith, Michelle Hopkins, and Jennifer Ashley demonstrate that RaceTrac employees' positions are not static — RaceTrac often promotes associates to managerial positions, although apparently some management positions remain nonsalaried positions. Some of these individuals may attempt to opt-in to the collective action, making an individualized inquiry necessary to determine whether alleged FLSA violations occurred while a specific employee was an associate. Perron Barconey's deposition indicates that further individualized inquiry would be necessary to ensure that managers who never worked as associates do not opt-in to the suit.

or denial of overtime pay has been provided.  Evidence of liability at one RaceTrac location would not necessarily show liability at another location.  There is insufficient evidence of a company-wide illegal policy to support a collective action.  *See England*, 370 F. Supp. 2d at 511.

## IV.     Conclusion

This court denies Mayon's motion to notify potential plaintiffs and for limited expedited discovery.[6]  The court declines to certify Mayon's proposed class.  She may proceed with her claim as an individual action.

SIGNED on July 15, 2005, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge

---

[6] Mayon's emergency motion to toll the statute of limitations applicable to putative class members is moot. Mayon's motion for expedited consideration of her motion for notice is also moot.